**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED MINE WORKERS OF AMERICA 1974 PENSION PLAN, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>ENERGY WEST MINING COMPANY,<br><br>*Defendant.* | Civil Action No. 1:18-cv-1905-RJL<br>(Consolidated with 1:18-cv-2085-RJL) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT TO ENFORCE ARBITRATION AWARD**

John R. Mooney
DC Bar No. 375886
Paul A. Green
DC Bar No. 383588
Olga M. Thall
DC Bar No. 1016248
Mooney, Green, Saindon,
Murphy & Welch, P.C.
1920 L. Street, NW, Suite 400
Washington, DC 20036
(202) 783-0100
(202) 783-6088 facsimile
jmooney@mooneygreen.com
pgreen@mooneygreen.com
omthall@mooneygreen.com

Stanley F. Lechner
DC Bar No. 370986
Charles P. Groppe
DC Bar No. 464035
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5079
(202) 739-3001 facsimile
stanley.lechner@morganlewis.com
charles.groppe@morganlewis.com

Glenda S. Finch
DC Bar No. 418206
Larry D. Newsome
DC Bar No. 254763
UMWA Health & Retirement Funds
2121 K Street, NW
Washington, DC 20037
gfinch@umwafunds.org
lnewsome@umwafunds.org

Dated: May 31, 2019

*Counsel for the 1974 Pension Plan
and its Trustees*

# TABLE OF CONTENTS

**Page**

SUMMARY ........................................................................................................... 1

ARGUMENT ........................................................................................................ 2

I.    THE ARBITRATOR'S DECISION IS ENTITLED TO SUBSTANTIAL
      DEFERENCE UNDER SECTION 4221 OF ERISA ....................................... 2

      A.    The Deferential Standard Of Review Under ERISA Section 4221(b)(3),
            Which Refers To Enforcement Under The Federal Arbitration Act ..................... 3

      B.    The Deferential Standard Of Judicial Review Under Section 4221(c) Of
            ERISA .................................................................................................... 4

II.   THE PLAN IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF
      WHETHER THE ACTUARIAL ASSUMPTIONS USED BY THE PLAN TO
      CALCULATE ENERGY WEST'S WITHDRAWAL LIABILITY WERE
      UNREASONABLE IN THE AGGREGATE ................................................... 5

      A.    The Main Question Presented To The Arbitrator Was Whether The Plan's
            Actuarial Assumptions Were Unreasonable In The Aggregate And Not
            Whether, As A Matter Of Law, The Plan Must Use The Same Discount
            Rate For Withdrawal Liability And Minimum Funding ...................................... 5

      B.    The Arbitrator's Award That The Plan's Actuarial Assumptions Were Not
            Unreasonable In The Aggregate Is Based On Factual Findings That Must
            Be Presumed Correct By This Court Pursuant To ERISA Section 4221(c) ......... 7

III.  ENERGY WEST'S ATTEMPT TO DEFEAT THE PLAN'S MOTION FOR
      SUMMARY JUDGMENT BY RELYING ON THE CONCRETE PIPE AND
      THE NY TIMES CASES IS WITHOUT MERIT ............................................ 10

IV.   THE PLAN IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF
      WHETHER IT IS EXEMPT FROM THE 20-YEAR CAP ON WITHDRAWAL
      LIABILITY INSTALLMENT PAYMENTS .................................................... 13

      A.    The Arbitrator's Decision That The Plan Is Exempt From The 20-Year
            Cap On Withdrawal Liability Payments Was Based On Numerous Factual
            Findings That Have Not Been Rebutted By Energy West ................................. 14

      B.    Energy West's Textual And Legal Arguments Are Without Merit .................... 19

V.    CONCLUSION .......................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

CASES

*Combs v. Classic Coal*,
  931 F. 2d 96 (D.C. Cir. 1991) .................................................................................. 8

*Concrete Pipe & Prods. Of California, Inc. v. Constr. Laborers Pension Tr. for
  S. California*,
  508 U.S. 602 (1993) ..................................................................... 10, 11, 12, 13

*Inhabitants of the Township of Montclair v. Ramsdell*,
  107 U.S. 147 (1883) ................................................................................................ 3

*Lowe v. SEC*,
  472 U.S. 181 (1985) ................................................................................................ 3

*Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*,
  331 F. Supp. 3d 365 (D.N.J. 2018) ................................................................ 5, 13

*The NY Times Co. v. Newspaper and Mail Deliverers'-Publishers' Pension Fund*,
  303 F.Supp. 3d 236 (S.D.N.Y. 2018), *appeal pending* ......................... 10, 11, 12, 13

*Wachtell, Lipton, Rozen & Katz v. C.I.R.*,
  26 F.3d 291 (2d Cir. 1994) .................................................................................. 11

*The Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan*,
  729 F. 2d 1502 (D.C. Cir. 1984) ....................................................................... 3, 4

STATUTES

Coal Industry Retiree Health Benefit Act, 26 U.S.C. § 9701(a)(3) ............................... 18

Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* .................. *passim*

ERISA Section 305(j)(1)(A)(ii), 29 U.S.C. § 1085(j)(1)(A)(ii) ................................... 18

ERISA Section 4211(d), U.S.C. § 1391(d) ............................................................ *passim*

ERISA Section 4219(c)(1)(B), 29 U.S.C. § 1399(c)(1)(B) ..................................... 14,19

ERISA Section 4221, 29 U.S.C. § 1401 ........................................................ 2-5,7,11,14

## TABLE OF AUTHORITIES

**Page(s)**

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* ...............................................................3,4

Internal Revenue Code Section 401(a). ........................................................................22

Internal Revenue Code Section 404(c) ................................................................... *passim*

Iinternal Revenue Code Section 501 (a) ........................................................................22

Multiemployer Pension Plan Amendment Act .................................................... *passim*

**OTHER AUTHORITIES**

American Heritage Dictionary of the English Language, 5th Ed. 2016 ........................20

Concise Oxford English Dictionary, 11th Ed. 2006 ....................................................20

H.R. Report 93-779 .....................................................................................................22

Merriam-Webster's College Dictionary, 10th Ed. 1993 ...............................................20

Senate Report of S. 1076, 96th Congress 2d Session (April 1980) .............................15

**SUMMARY**

Plaintiffs, the United Mine Workers of America 1974 Pension Plan ("1974 Plan" or "Plan") and its Trustees (collectively, "Plaintiffs" or "Trustees") hereby submit this reply in support of their motion for summary judgment, seeking enforcement of the Arbitrator's decision in this case regarding pension withdrawal liability.  Both parties agree that there are no genuine issues of material fact in dispute and that this case is appropriate for summary judgment.  Based on the detailed findings made by the Arbitrator in a comprehensive 56-page decision, combined with the deferential standard of review of the Arbitrator's decision under the Employee Retirement Income Security Act of 1974 ("ERISA"), Plaintiffs respectively submit that summary judgment should be granted in the Plan's favor and that the Arbitrator's decision should be enforced.

As summarized below and discussed in Plaintiffs' prior briefs, the facts and law strongly favor the Plan.  Regarding issue #1 (*i.e.*, whether the actuarial assumptions used by the Plan to calculate Energy West Mining Company's ("Energy West") withdrawal liability were unreasonable in the aggregate), the Arbitrator's decision was based on several factual findings that are not clearly erroneous, including testimony by three professional actuaries, the selection of a discount rate consistent within the range of reasonable actuarial practice, significant admissions by Energy West's expert witness, and the critical and declining financial status of the Plan.  (Award at 9-24, 49-54).  Regarding issue #2 (*i.e.*, whether the Plan is exempt from the 20-year cap on withdrawal liability installment payments), the Arbitrator based his decision on several factual findings that are not clearly erroneous, including the unique history of the 1974 Plan, the special exemptions from certain withdrawal liability provisions that Congress enacted for the coal industry in the Multiemployer Pension Plan Amendment Act ("MPPAA") in 1980, and an unblemished 45-year history in which the 1974 Plan has been recognized by the United Mine Workers of America ("UMWA"), the Bituminous Coal Operators' Association, Inc. ("BCOA"), the IRS, federal courts,

and Congress as a "continuation of" a pension plan described in Section 404(c) of the Internal Revenue Code.  (Award at 2-9, 54-56).

Faced with this thorough and thoughtful arbitration decision that is grounded in well-supported facts, and faced with statutory provisions that require the Court to give deference to the Arbitrator's decision (including a presumption that that findings of fact by the Arbitrator are correct and rebuttable only by a clear preponderance of the evidence), Energy West attempts to defeat the Plan's motion for summary judgment by ignoring and misstating the factual record on which the Arbitrator relied.  Because the factual record is devastating to Energy West's position, the company attempts to block it out and render it meaningless.  Specifically, Energy West attempts to re-cast the arbitration as a dispute over legal issues and subject to *de novo* judicial review.

Energy West's opposition to the Plan's Motion For Summary Judgment is without merit because, among other things, it misstates the standard of review, ignores and misstates the factual record on which the Arbitrator based his decision (including fatal admissions from its own expert witness), and improperly attempts to have the Court second-guess the decision of an experienced Arbitrator regarding actuarial assumptions and unique facts applicable to withdrawal liability, which issues are grist in the mill for ERISA arbitrators.

## ARGUMENT

## I.    THE ARBITRATOR'S DECISION IS ENTITLED TO SUBSTANTIAL DEFERENCE UNDER SECTION 4221 OF ERISA.

As the Arbitrator correctly noted in his decision, there is a "very substantial burden of proof imposed on employers seeking to overturn a withdrawal liability assessment by Section 4221." (Award at 43).   In addition to the presumptions of correctness that are accorded to the Plan's

determinations in arbitration, Section 4221 contains two provisions that apply to judicial review of the Arbitrator's decision. Each is summarized below.

### A. The Deferential Standard Of Review Under ERISA Section 4221(b)(3), Which Refers To Enforcement Under The Federal Arbitration Act.

The first provision is ERISA Section 4221(b)(3), which states that arbitration decisions regarding multiemployer pension plans "shall" be "enforced in United States courts as an arbitration proceeding carried out under title 9, United States Code," which refers to the Federal Arbitration Act (sometimes referred to as the "United States Arbitration Act"). Energy West acknowledges that the Federal Arbitration Act ("FAA") authorizes only limited review of an arbitrator's decision (EW Opp. at 2), but argues that "no cases cited by the Plan support the application of the deferential FAA standard of review." (*Id*).

The first problem with Energy West's argument is that it ignores that statutory language that clearly applies to "United States courts," and clearly states that arbitration decisions "shall" be "enforced" in the U.S. courts as proceedings under the FAA. Energy West essentially is arguing that this statutory provision is meaningless or mere surplusage, and does not apply to the Plan's motion to "enforce" the arbitration award. (*Id*. at 4). Energy West's attempt to disregard and nullify a statutory provision enacted by Congress is contrary to well-established principles of statutory construction. *See, e.g, Lowe v. SEC*, 472 U.S. 181, 208 n. 53 (1985) (court "must give effect to every word that Congress used in the statute"); *Inhabitants of the Township of Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883) ("It is the duty of the court to give effect, if possible, to every clause and word of a statute, avoiding, as it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed").

Second, Energy West acknowledges that the D.C. Circuit in *The Washington Star Co. v. Int'l Typographical Union Negotiated Pension Plan*, 729 F. 2d 1502, 1505 (D.C. Cir. 1984),

clearly stated that under MPPAA, "[t]he court must enforce the Arbitrator's decision in accordance with the United States Arbitration Act, 9 U.S.C. §§ 1-14 (1982), which authorizes only limited review." Energy West, however, cavalierly attempts to dismiss this summary of the standard of review as "dicta" that "misconstrues the quoted statutory provision." (EW Opp. at 2-3). To the contrary, the *Washington Star* case is a significant decision upholding the constitutionality of the withdrawal liability provisions of MPPAA. The D.C. Circuit accurately summarized the judicial review provisions of MPPAA, and its statement that a court must "enforce" an arbitrator's decision in accordance with the FAA, "which authorizes only limited review," has never been overruled or disavowed by any subsequent ruling in this Circuit. Whether courts in other circuits follow the D.C. Circuit is not binding on this Court.

    **B.**      **The Deferential Standard Of Judicial Review Under Section 4221(c) Of ERISA.**

ERISA Section 4221(c) provides that in any civil action concerning the assessment of withdrawal liability under MPPAA and decided by arbitration, "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct." Energy West acknowledges this important presumption, but argues that it essentially is irrelevant to this case because the presumption does not apply to questions of law. According to Energy West, the Arbitrator's entire decision is based exclusively or primarily on legal findings that are subject to *de novo* judicial review. (EW Opp. at 1-5).

Energy West's argument that the Arbitrator's decision was based exclusively or primarily on legal findings is incorrect. As discussed in greater detail below, the record in this case plainly demonstrates that the Arbitrator's decision was based primarily on factual finding that are presumed correct and that have not been rebutted by Energy West. The standard of judicial review

mandated by ERISA Section 4221(c) alone entitles the Plan to summary judgment and an order

enforcing the Arbitrator's Award.

**II.    THE PLAN IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER THE ACTUARIAL ASSUMPTIONS USED BY THE PLAN TO CALCULATE ENERGY WEST'S WITHDRAWAL LIABILITY WERE UNREASONABLE IN THE AGGREGATE.**

As discussed below, Energy West's characterization of this case as "turning on legal

issues" is contradicted by the questions stipulated to the Arbitrator, the evidence presented to the

Arbitrator, and the factual findings of the Arbitrator that formed the basis of his Award.

**A.    The Main Question Presented To The Arbitrator Was Whether The Plan's Actuarial Assumptions Were Unreasonable In The Aggregate And Not Whether, As A Matter Of Law, The Plan Must Use The Same Discount Rate For Withdrawal Liability And Minimum Funding.**

In *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund*, 331 F. Supp. 3d 365,

371 (D.N.J. 2018), the first question presented was, "As a matter of ERISA law, must a pension

plan's actuary use identical actuarial assumptions to calculate the plan's satisfaction of minimum

funding requirements and its unfunded vested benefits ('UVB') for withdrawal liability?"  That is

a legal question, but that was not the question presented to the Arbitrator in this case. In this case,

the first question presented to the Arbitrator was stipulated to be as follows:

> Whether the actuarial assumptions used by the UMWA 1974 Pension Plan to calculate Energy West's withdrawal liability were unreasonable in the aggregate for a withdrawal that occurred between July 1, 2015 and June 30, 2016?  (Award at 1).

In this case, Energy West made it clear to the Arbitrator from the outset that it was not

contending, as a matter of law, that the 1974 Plan's discount rate for withdrawal liability purposes

must be the same as its discount rate for minimum funding purposes.  Indeed, Energy West's expert

witness, actuary Scott Hittner, clearly stated in his expert report that it was "understandable" that

the Plan's enrolled actuary used a <u>lower</u> discount rate for withdrawal liability purposes than it used

for funding purposes. (Jt. Ex. __ at para. 24). Similarly, Mr. Hittner stated that the discount rates may be different because "withdrawal represents a settlement of Energy West's liability [and] [t]he plan can no longer adjust contribution requirements for any employer after it withdraws." (Jt. Ex. __ at para. 23).

At the Arbitration hearing, Mr. Hittner acknowledged that the discount rate for withdrawal liability purposes need not be the same as the discount rate for minimum funding purposes. Mr. Hittner testified that it was "not unreasonable" for the Plan's actuary to follow guidance in Actuarial Standard of Practice 27, Section 3.9(b) ("ASOP"), which provides that in selecting a discount rate for purposes of settlement, an actuary may use a discount rate *implicit in annuity rates.* (Tr. 149). Significantly, Mr. Hittner admitted at the hearing that "withdrawal liability is a settlement of an employer's obligation to a plan" (Tr. 146), and that *PBGC discount rates are "a proxy for annuity prices"* (Tr. 147, emphasis added).

In sum, the Arbitrator clearly and correctly understood at the arbitration hearing that Energy West was not advocating, as a matter of law, that the discount rate selected for withdrawal liability purposes must be the same as the discount rate selected for minimum funding purposes. (Award at 18, stating that, "During his testimony at the arbitration, Hittner confirmed that he was not advocating that a plan must use the same interest rate for funding and withdrawal liability purpose, because the rates are for different purposes." (*See also* Award at 19-20, 46, 49-50). In other words, contrary to the impression created by Energy West in its opposition to the Plan's motion for summary judgment, the main issue presented to the Arbitrator in this case was not a "legal issue" but rather, as stipulated by the parties, whether the Plan's actuarial assumptions for calculating Energy West's withdrawal liability were "unreasonable" in the aggregate.

**B.    The Arbitrator's Award That The Plan's Actuarial Assumptions Were Not Unreasonable In The Aggregate Is Based On Factual Findings That Must Be Presumed Correct By This Court Pursuant To ERISA Section 4221(c).**

In its misguided attempt to re-cast the case presented to and decided by the Arbitration as a dispute over legal interpretation issues, Energy West ignores and misstates the factual record on which the Arbitrator relied in reaching his decision.  As summarized below and in our prior briefs, the Arbitrator's decision should be enforced because it is based exclusively or primarily on factual findings that are presumed correct.  The Arbitrator's decision that the Plan's actuarial assumptions are not unreasonable was based on the following factual findings, none of which has been rebutted by Energy West:

- The 1974 Plan is in "critical and declining" financial status and projected to become insolvent by 2022.  (Award at 9-10).

- All three of the actuaries who testified at the arbitration hearing or in deposition agreed that their calculations are guided by the Actuarial Standards of Practice ("ASOPs").  (Award at 11).

- ASOP 27, Section 3.9(b) states that in selecting a discount rate, the actuary should consider the purpose of the measurement as a primary factor.  If the purpose is settlement or defeasance, the actuary "may use a discount rate implicit in annuity prices or other defeasance or settlement options."  (Award at 12).

- The Plan's actuary, William Ruschau of United Actuarial, is a well-qualified actuary with over 30 years of experience. (Award at 13).

- Mr. Ruschau studied and selected the Plan's actuarial assumptions for withdrawal liability purposes by following an analytical process and considering past experience of the Plan and reasonable expectations.  (Award at 13-14).

- The only actuarial assumption in which the Plan's past experience was not considered was the discount rate assumption because past experience has no bearing on future returns. In addition, because withdrawal liability is a settlement of an employer's obligations to the Plan, Mr. Ruschau selected PBGC discount rates, which are relatively risk-free to the Plan and are fair to both the withdrawing employers and the employers remaining in the Plan.  (Award at 14-15).

- The company's expert witness, Scott Hittner, is an experienced actuary but his practice is devoted largely to single-employer plans, which are not subject to withdrawal liability.  (Award at 15-16).

- Mr. Hittner's opinion was that the Plan's use of PBGC discount rates to calculate the present value of the Plan's benefit was too low because the Plan is facing insolvency,

and will have to reduce benefits in the future. Therefore, according to Mr. Hittner's theory, the discount rate should be <u>increased</u> to take into account the fact that not all the UVBs will be paid. Mr. Hittner did not assert that the Plan was obligated to use the same discount rate for withdrawal liability and funding purposes, and stated that it was "understandable" that the Plan's actuary used a lower discount rate for withdrawal liability purposes. (Award at 16-18).

- Under Mr. Hittner's theory, the worse-off a plan is financially, the higher the discount rate should be, which produces a lower withdrawal liability payment to the Plan. Mr. Hittner was not aware of any arbitration or court case endorsing his theory, and acknowledged that other actuaries and funds use PBGC rates for withdrawal liability purposes, including funds in critical and declining financial status. (Award at 18-19).

- Mr. Hittner admitted that it was appropriate for an actuary to consider the purpose of a measurement when selecting a discount rate; that withdrawal liability is a settlement of an employer's obligation to a plan; that ASOP 27, Section 3.9 (b) states that for purposes of settlement, an actuary may use a discount rate implicit in annuity prices; and that PBGC rates are a proxy for annuity prices. (Award at 18-19).

- Mr. Hittner further admitted that it was "not inappropriate" and "not unreasonable" for the Plan's actuary to the follow the guidance of ASOP 27, Section 3.9 (b), by selecting for withdrawal liability settlement purposes a discount rate implicit in annuity prices (which includes PBGC rates). Mr. Hittner attempted to qualify his admission by stating that discount rates implicit in annuity prices (i.e., PBGC rates) are not the "most appropriate" discount rate in his view. (Award at 19-20). As discussed in our prior briefs, however, this qualification is insufficient to meet Energy West's burden of proof. "[T]he test is not which withdrawal liability determination is the most reasonable but rather whether the challenged determination is unreasonable or clearly erroneous." *Combs v. Classic Coal,* 931 F. 2d 96, 99 (D.C. Cir. 1991).

- The Plan's expert witness, Dr. Ethan Kra, is an experienced and nationally-recognized expert regarding multiemployer pension plans and withdrawal liability. Dr. Kra reviewed all of the Plan's actuarial assumptions, including the discount rate assumption, and did not find them to be unreasonable. In Dr. Kra's view, a risk-free discount rate (such as PBGC rates) is appropriate for withdrawal liability purposes because the withdrawing employer bears no future investment risk, and such risk should not be transferred to the remaining employers in the fund. Dr. Kra is aware of several other actuarial firms that use PBGC rates for withdrawal liability purposes, and is not aware of any actuary "other than Hittner who has used, advocated, or ever discussed using a rate that factors in the creditworthiness of a plan, specifically a projected insolvency, when setting the withdrawal liability discount rate." (Award at 20-25).

All of the above findings of fact, which are presumed correct, were relied on by the Arbitrator in reaching his decision that the Plan's actuarial assumptions were not unreasonable in the aggregate. The Arbitrator concluded that Energy West was bound by the record evidence; that

the admissions by its expert Mr. Hittner are fatal to its claim; that Mr. Ruschau's use of PBGC rates was reasonable and Mr. Hittner's theory was not reasonable; that Dr. Kra's explanation was persuasive regarding the use of risk-free rates for withdrawal liability purposes; and that because the 1974 Plan is facing insolvency within a few years and needs approximately $600 million per year to pay pension benefits, it will need to liquidate its investments to pay benefits and will not be able to take increased risks associated with higher returns.  (Award at 49-53).

In opposing the Plan's motion for summary judgment, Energy West does not come close to rebutting the extensive factual findings on which the Arbitrator based his decision.  The closest it comes to even attempting to rebut the Arbitrator's factual findings is by asserting that Mr. Hittner's admissions were taken "out of context" and should have "no bearing" on the reasonableness of the Plan's use of PBGC discount rates for withdrawal liability purposes.  (EW Opp. at 12). Remarkably, Energy West asserts that Mr. Hittner's testimony "*is irrelevant to the question posed to this court.*" (*Id.,* emphasis added).

Energy West's attempt to have the Court disregard the testimony of its own expert witness on the critical issue presented (the reasonableness of the Plan's discount rate for withdrawal liability purposes) is astonishing and demonstrates the extremes to which the company is resorting to avoid the factual record on which the Arbitrator based his decision.  Moreover, Energy West's feeble attempt to render irrelevant the testimony of its own expert plainly does not satisfy Energy West's statutory burden of rebutting the Arbitrator's findings by a clear preponderance of the evidence.

In sum, the above facts must be presumed correct by the Court, and they provide overwhelming support for the Arbitrator's decision.  Because Energy West has not rebutted any

of these critical findings, the Court has more than sufficient grounds to defer to the Arbitrator who heard the evidence and enforce the Arbitrator's award.

III.    **ENERGY WEST'S ATTEMPT TO DEFEAT THE PLAN'S MOTION FOR SUMMARY JUDGMENT BY RELYING ON THE *CONCRETE PIPE* AND *THE NY TIMES* CASES IS WITHOUT MERIT.**

In opposing the Plan's motion for summary judgment, Energy West attempts to divert the Court from the factual record and convince the Court that the Arbitrator erred as a matter of law by upholding the Plan's actuarial assumptions that allegedly were not the actuary's "best estimate of anticipated plan experience." (EW Opp. at 1, 5-9). Energy West argues, based on the Supreme Court's decision in *Concrete Pipe & Prods. Of California, Inc. v. Constr. Laborers Pension Tr. for S. California,* 508 U.S. 602, 632-33 (1993), and a recent decision by a district court in the Southern District of New York, *The NY Times Co. v. Newspaper and Mail Deliverers'-Publishers' Pension Fund,* 303 F. Supp. 3d 236 (S.D.N.Y. 2018), *appeal pending*, that, as a matter of law, the Plan's use of PBGC discount rates could not represent the Plan's "best estimate of anticipated plan experience" because the Plan used a different and higher discount rate for funding purposes. According to Energy West, "the rates for withdrawal liability must be consistent with the rates used for funding purposes," and "[c]onsidering the actuary's selection of [the] funding rate, the PBGC rates cannot be the actuary's best estimate as required by the statute and cannot be reasonable as a matter of law." (EW Opp. at 5).

Energy West's attempt to rely on the *Concrete Pipe* case is without merit for several reasons that are explained by the Plan in substantial detail in its opposition to Energy West's motion for summary judgment. *See* Plaintiff's Opposition to Defendant's Motion for Summary Judgment, filed May 14, 2019, at 18-29. We summarize briefly below some of the key points:

- *Concrete Pipe* held that the statutory presumptions favoring multiemployer pension plans in withdrawal liability disputes were not unconstitutional. The *Concrete Pipe*

case did not hold that it was improper or unlawful for a plan to use different discount rates for withdrawal liability purposes and minimum funding purposes. To the contrary, by upholding the constitutionality of MPPAA's presumptions favoring multiemployer pension plans, the result of the *Concrete Pipe* litigation was to uphold an arbitration decision in which the arbitrator concluded that it was not unreasonable for the plan to use the "Segal blended" discount rate for withdrawal liability purposes, which was different from the discount rate used by the plan for minimum funding purposes. *See* JA ____, Arbitrator's decision in the *Concrete Pipe* case, reproduced as a Joint Appendix in Concrete Pipe's Supreme Court litigation.

- The "best estimate" language on which Energy West attempts to rely is not in ERISA Section 4221, which sets forth the standards and presumptions for reviewing plan determinations and arbitration decisions. Courts have stated that the "best estimate" provision is not a substantive requirement but "basically procedural in nature and is principally designed to insure that the chosen assumptions actually represent the actuary's own judgment rather than the dictates of plan administrators or sponsors." *Wachtell, Lipton, Rozen & Katz v. C.I.R.,* 26 F.3d 291, 296 (2d Cir. 1994).

- In the 26 years since the *Concrete Pipe* decision was rendered, no court has held, as a matter of law, that a plan must use the same discount rate for withdrawal liability purposes as it uses for minimum funding purposes, or that a plan violates the "best estimate" provision by using different discount rates for different purposes.

- The Pension Benefit Guaranty Corporation ("PBGC") has stated in an official opinion letter, and on several other occasions, that there is no requirement that a plan use the same actuarial assumptions for withdrawal liability purposes that it uses for minimum funding purposes.

- Even assuming, *arguendo,* that the Plan was required to use the same discount rate for withdrawal liability and minimum funding purposes, there is no evidence demonstrating that the funding rate used by the Plan at the time would have been a "reasonable" rate for withdrawal liability purposes. Logically, the funding rate could have been too high, especially in light of the critical and declining financial condition of the 1974 Plan and its need to liquidate assets to pay pension benefits. There is no evidence whatsoever in this case that the funding rate would have been a reasonable discount rate for withdrawal liability for a plan such as the 1974 Plan that was facing insolvency.

- The Plan's actuary in the Energy West case testified that the PBGC rates used for withdrawal liability purposes are his "best estimate" of future returns on a risk-free basis. It is unreasonable to assume that the Plan will achieve high investment returns in the future because it is facing insolvency, is required to liquidate its investments to raise cash to pay pension benefits, and as Mr. Hittner acknowledged, the Plan will have "investable assets only until the 2022 plan year." (Hittner Report at para. 8).

Energy West's attempt to rely on the recent decision by the United States District Court for the Southern District of New York in the *NY Times* case is equally without merit, in part

because it relies on the "best estimate" theory noted above that never has been accepted by any

court. The *NY Times* case is not helpful to Energy West in this case for several additional

reasons, including:

- The court in *NY Times* found no evidence that the plan's actuary considered the Segal blended discount rate to be his "best estimate" of the plan's anticipated experience. In contrast, in the case before this Court, the Plan's actuary explicitly testified that the PBGC discount rates constituted his best estimate of anticipated plan experience.

- Unlike in the *NY Times* case, the employer's expert witness in this case admitted that the Plan's use of an annuity-based discount rate (*i.e.,* PBGC rates) for withdrawal liability purposes was not inappropriate and not unreasonable.

- Unlike the pension plan in the *NY Times* case that was in the "green zone" within the meaning of the Pension Protection Act, and thus not facing insolvency, the Plan in this case is facing insolvency in a few years, has no long term investment horizon, and is less able to incur or withstand investment risk.

- Unlike the *NY Times* case, it is undisputed in this case that the Plan's actuary followed accepted actuarial guidance (ASOP 27, Section 3.9(b)) by selecting discount rates for withdrawal liability settlement purposes (*i.e.,* PBGC discount rates) that are based on and a proxy for annuity prices.

- Unlike the *NY Times* case, the employer's expert witness in this case based his opinion on a theory that has never been accepted by any arbitrator or court, and a theory that, according to Dr. Kra, has never been used, advocated, or even discussed by any actuary other than Mr. Hittner. The Hittner theory leads to the absurd conclusion that the worse-off the financial condition of the Plan, the higher the Plan's discount rate should be, resulting in lower withdrawal liability payments to the Plan at the very time the Plan is in extreme financial distress.

- Finally, the *NY Times* case is an anomaly, is being vigorously appealed, and may be reversed on appeal.

The *NY Times* decision was issued *after* Energy West and the Plan had completed their

hearing in this case, and *after* they had submitted their post-hearing briefs, including reply briefs.

(Award at 30). The main challenge raised by the NY Times was that based on the Supreme Court's

decision in *Concrete Pipe*, the plan's actuary was required, as a matter of law, to use the same

discount rate for withdrawal liability and funding purposes. Even though Energy West did not

make any such argument to the Arbitrator in the case currently before this Court, and even though

Energy West's expert witness was not advocating that the same discount rates be used for these

different purposes, the Arbitrator went the "extra mile" and permitted both Energy West and the Plan to file supplemental briefs on this issue.

In his decision, the Arbitrator discussed the parties' supplemental briefs and arguments (Award at 41-43), and whether he found them to be persuasive.  For the reasons stated above and in the Arbitrator's decision, the Arbitrator found the district court's decision in *NY Times* to be "unpersuasive." (Award at 44).  The Arbitrator's view of the *Concrete Pipe* and *NY Times* cases is explained on pages 44-49 of his decision, and is consistent with the reasoning of the court in *Manhattan Ford Lincoln, Inc. v. UAW Local 259 Pension Fund,* 331 F. Supp. 3d (D.N.J. 2018), which the Arbitrator adopted as part of his opinion and award in this case.  (Award at 49). In sum, even though Energy West in this case did not make the same arguments or present the same evidence that was presented to the Arbitrator in the *NY Times* case, the court's decision in *Manhattan Ford Lincoln* lends further support to the Arbitrator's rationale and Award in this case, and further undermines the position of Energy West.

## IV.    THE PLAN IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF WHETHER IT IS EXEMPT FROM THE 20-YEAR CAP ON WITHDRAWAL LIABILITY INSTALLMENT PAYMENTS.

The Arbitrator's decision that the Plan is exempt from the 20-year cap on withdrawal liability installment payments is supported by numerous facts that are undisputed and summarized below in subsection A.  In addition, Energy West's attempt to defeat the Plan's motion for summary by advancing various legal arguments is without merit for several additional reasons that are addressed in subsection B below.

**A.    The Arbitrator's Decision That The Plan Is Exempt From The 20-Year Cap On Withdrawal Liability Payments Was Based On Numerous Factual Findings That Have Not Been Rebutted By Energy West.**

In reaching his decision that the Plan is exempt from the 20-year cap on withdrawal liability installment payments, the Arbitrator made several factual findings that must be presumed correct by the Court under ERISA Section 4221(c) because they have not been rebutted by Energy West. In responding to the Plan's Statement of Undisputed Material Facts, Energy West attempts to gloss over these facts by characterizing them as "undisputed" but "immaterial." *See* Energy West Mining Company's Response to the Plaintiff's Statement of Undisputed Material Facts, filed on May 14, 2019.

Despite Energy West's attempt to convert this issue into a pure legal dispute, it is important for the Court to recognize that the Arbitrator made several factual findings that are undisputed and support the conclusion that the 1974 Plan is unique among other multiemployer pension plans and exempt from several withdrawal liability provisions in MPPAA, including but not limited to the 20-year cap on installment payments of withdrawal liability.

As explained in the Plan's Opposition to Defendant's Motion for Summary Judgment, filed with the Court on May 14, 2019 (hereinafter "Plan's 5/14 Opp."), and incorporated by reference herein, the question of whether the Plan is exempt from the 20-year cap arose in 1980 when Congress enacted MPPAA as an amendment to ERISA. Specifically, ERISA Section 4211(d)(2) is the provision that created the special withdrawal liability exemptions that are unique to plans in the coal industry. Section 4211(d)(2) provides in relevant part that the 20-year cap set forth in ERISA Section 4219(c)(1)(B), 29 U.S.C. Section 1399(c)(1)(B), does not apply to "*a plan described in*" ERISA Section 4211(d)(1). ERISA Section 4211(d)(1) in turn refers to "a plan to

which section 404(c) of title 26 [the Internal Revenue Code], or *a continuation of* such a plan,

applies . . . ." (Emphasis added).

This provision was not enacted by Congress in a vacuum, and its prior history is important

to understanding its meaning.  In his decision, the Arbitrator made several factual findings about

the unique history of the UMWA Health and Retirement Funds, the special exemptions from

certain withdrawal liability provisions that Congress enacted for only the coal industry in MPPAA,

and an unbroken 45-year history in which the 1974 Plan has been recognized by the UMWA,

BCOA, the IRS, federal courts, and Congress as a "continuation of" a pension plan described in

Section 404(c) of the Internal Revenue Code.  (Award at 2-9, 54-56).  Significantly, none of this

has been rebutted by Energy West.  Several of the key points are briefly summarized below:

- The historical origins of the 1974 Plan are unique and date back to 1946, as the result of an agreement between the federal government and the UMWA during a time in which the federal government had seized the nation's coal mines.  (Award at 2-3).

- In 1954, Congress enacted Section 404(c) of the Internal Revenue Code.  Section 404(c) applied only to plans in the coal industry and no other industry.  The main coal industry plan at the time was the 1950 Welfare and Retirement Fund ("1950 W&R Fund"). (Award at 3-4).

- From 1954 to 1974, it is undisputed in this case that the 1950 W&R Fund was a plan covered by IRC Section 404(c).  (Award at 4).

- In 1974, as a result of the enactment of ERISA, BCOA and the UMWA restructured the 1950 W&R Fund by separating it into two pension plans and two health benefit plans.  The two pension plans were the 1950 Pension Plan and the 1974 Pension Plan.  The 1950 and 1974 Plans expressly were created by BCOA and the UMWA as a "continuation of" the 1950 W&R Fund.  (Award at 5).  Significantly, the National Bituminous Coal Wage Agreement of 1974, which created the 1974 Plan, specifically stated at page 83 that the 1974 Plan "is *a continuation of* the pension program of the 1950 Fund."  (JA at ___).

In 1980, when Congress enacted MPPAA, the UMWA and BCOA lobbied for the inclusion

of several special withdrawal liability provisions that applied only to plans in the coal industry.

(Award at 6).  (See also JA ___, Senate Report of S. 1076).  Significantly, when Congress in 1980

enacted the special withdrawal liability exemptions in Section 4211(d) of ERISA, it used the very same "continuation of" language that had been used by the UMWA and BCOA in the 1974 and 1978 NBCWAs, which expressly state that both the 1950 and 1974 Plans were "a continuation of" the 1950 Fund. (JA at ___).

This history, in and of itself, strongly supports the Arbitrator's conclusion that the 1974 Plan is "a continuation of" a plan described in IRC Section 404(c) and thus exempt from the 20-year cap on withdrawal liability installment payments.  But there is more.  By the time that Congress enacted the special withdrawal liability provisions in ERISA Section 4211(d), the IRS had stated in both a letter and a formal ruling that both the 1950 and 1974 Plans were "*a continuation of*" the 1950 W&R Fund and plans "within the provisions of" and "*described in*" Section 404(c) of the IRC.  *See* Award at 5-6, quoting the IRS letter and ruling, which state in relevant part:

- November 25, 1974 IRS letter stating that the Service is prepared to rule that the 1950 and 1974 Plans are "*a sufficient continuation of* the United Mine Workers Welfare and Retirement Fund of 1950 to come within the provisions of Section 404(c) of the Internal Revenue Code of 1954, as amended by the Employee Retirement Income Security Act of 1974 . . . ." (emphasis added).
- June 9, 1975 IRS ruling stating that "we conclude that the 1950 Pension Plan and Trust, and the 1974 Pension Plan and Trust represent *a continuation of* the United Mine Workers of America Welfare and Retirement Fund of 1950, and therefore constitute *a plan described in* section 404(c) of the Code." (emphasis added).

Significantly, when Congress in 1980 enacted the special withdrawal liability exemptions in Section 4211(d) of ERISA, it used the very same "continuation of" and "a plan described in" language that the IRS had used in describing both the 1950 and 1974 Plans.  This, in and of itself, strongly supports the Arbitrator's conclusion that the 1974 Plan is "a continuation of" a plan "described in" IRC Section 404(c) and thus exempt from the 20-year cap on withdrawal liability installment payments.

Despite this undisputed factual evidence showing the source of the language that Congress used in creating the special withdrawal liability exemptions applicable to the coal industry plans, Energy West argues without any factual or caselaw support that the special withdrawal liability exemption for the coal industry was temporary, confined to the 1950 Plan, and does not apply or no longer applies to the 1974 Plan. Once again, these assertions are refuted by evidence in the record.

In the 1980s, shortly after these special withdrawal liability provisions were enacted by Congress in MPPAA, there were four reported federal district court cases in which the status of the 1974 Plan and/or the 1950 Plan was directly at issue, or described by the court in the context of the litigation. In these cases, as summarized by the Arbitrator, the courts held or stated without exception that the 1974 Plan was "a continuation of the earlier plan," "covered by 404(c) of the Internal Revenue Code," exempt from the de minimis withdrawal liability rule, "covered by" IRC Section 404(c), and "the only 404(c) plans under the Tax Code." (Award at 7-9; *see also* Plan's 5/14 Opp. at 34).

In addition, there are two additional sets of undisputed facts that refute Energy West's arguments and support the conclusion of the Arbitrator. Specifically, the parties that created the 1974 Pension Plan (the UMWA and the BCOA) have continued to regard and treat the 1974 Plan as "a continuation of" of the 1950 W&R Plan. The undisputed record shows the following industry practice:

- In each National Bituminous Coal Wage Agreement negotiated subsequent to 1980, including the NBCWAs of 1981, 1984, 1988, 1993, 1998, 2002, 2007, 2011, and 2016, the bargaining parties specifically agreed in collective bargaining and expressly stated in national labor agreements that the 1974 Plan is a "*continuation of*" the UMWA Welfare and Retirement Fund of 1950. (*See* JA at __). Similarly, the Plan Documents for the 1974 Plan, including the Plan Document from 1988, 1993, 1998, 2002, and 2011, each state specifically in the Introduction that the 1974 Plan is a

"*continuation of* the benefit program established under the UMWA Welfare and Retirement Fund of 1950." (*See* JA at  __) (Emphasis added).

Moreover, Congress continues to regard and refer to both the 1950 and 1974 Pension Plans as plans "described in" IRC Section 404(c), or "a continuation thereof," and continues to enact legislation that applies only to "a plan described in" IRC Section 404(c) or "a continuation of" such a plan.  As correctly noted by the Arbitrator in his decision:

- In 1992, when enacting the Coal Industry Retiree Health Benefit Act, which is codified at 26 U.S.C. § 9701(a)(3),  Congress defined the 1974 Plan as follows: "The term '1974 UMWA Pension Plan' means a pension plan *described in* section 404(c) (or *a continuation thereof),* participation in which is substantially limited to individuals who retired in 1976 and thereafter." (Emphasis added).

- In the Pension Protection Act of 2006, codified in relevant part at 29 U.S.C. §§1085 *et seq.*, Congress created special definitions for the terms "bargaining party" and "plan sponsor" that apply only to a plan *described under* Section 404(c) or *any continuation of* such plan. *See* ERISA Section 305(j)(1)(A)(ii), 29 U.S.C. § 1085(j)(1)(A)(ii).  (Emphasis added).

In the face of this overwhelming and undisputed factual evidence, Energy West incredibly argues that the Plan is relying only on an outdated IRS ruling, and that the 1974 Plan is no different from other multiemployer pension plans. (EW Opp. at 1, 17).  These contentions are soundly refuted by the undisputed facts summarized above.  In addition, Energy West argues that the statements, holdings, and findings of the courts and Congress are "misleading" because "[c]ourts's have merely assumed, without analysis, that the 1974 Plan is a continuation of the Original Fund," and that the Congressional definition of the 1974 Plan "was not carefully considered."  (*Id*. at 18).

These arguments are without merit and unworthy of serious consideration.  Energy West is the first company since 1980 to challenge the Plan's special statutory exemption from the 20-year cap.  Energy West cannot cite any authority whatsoever supporting its position. (Award at 54). Nevertheless, Energy West is asking this Court to issue an unprecedented ruling directly contrary to how the Plan has *functioned and been accepted in the coal industry* for nearly 40 years.

Despite the overwhelming and undisputed evidence summarized above and in the Arbitrator's opinion, Energy West essentially is arguing that Congress, the IRS, federal courts, and the entire coal industry have been duped or hoodwinked into accepting the 1974 Plan as a continuation of a plan described in IRC 404(c) and thus covered by the special withdrawal liability exemptions of MPPAA (including exemption from the 20-year cap). Energy West's assertions are unfounded and supported and do not satisfy its burden of proof under any standard of judicial review.

### B.    Energy West's Textual And Legal Arguments Are Without Merit.

The language of ERISA Sections 4211(d)(1) and 4211(d)(2), read together, plainly exempt the 1974 Plan from various withdrawal liability provisions of MPPAA, including the 20-year cap set forth in ERISA Section 4219(c)(1)(B), 29 U .S.C. 1399(c)(1)(B). The starting point is Section 4211(d)(2), which provides that the 20-year cap (among other provisions) "*shall not apply* with respect to the withdrawal of an employer from *a plan described in paragraph (*1) unless the plan is amended to provide that any of such sections apply." (Emphasis added). Paragraph (1) [4211(d)(1)] *describes* "a plan to which section 404(c) or Title 26*, or a continuation of* such a plan, applies, unless the plan is amended . . . ." (Emphasis added). IRC Section 404(c) describes the 1950 W&R Fund, and the 1974 Plan is "a continuation of" the 1950 W&R Fund. In short, the statutory exemption set forth in ERISA Section 4211(d)(2), when read together with Section 4211(d)(1), clearly applies to the 1974 Plan, which is "a continuation of" the 1950 W&R Fund.

Despite this straightforward reading of statutory language that applies only to the coal industry, Energy West makes several textual and legal arguments in an attempt to persuade the Court that the statutory provisions do not mean what they say. None of these arguments has any merit.

First, regarding the text of the statutory exemption, Energy West focuses on ERISA Section 4211(d)(1) in isolation and without regard to Section 4211(d)(2), which is the source of the

exemption from the 20-year cap.  (EW Opp. at 15).  Significantly, Section 4211(d)(2) applies to any plan "described in" Section 4211(d)(1).  Energy West conspicuously avoids the "described in" language because it completely undercuts Energy's West's argument.  The plan "described in" Section 4211(d)(1) is the 1950 W&R Fund, and the 1974 Plan is "a continuation of" the 1950 W&R Fund.

Second, in addition to disregarding the key language stating that the statutory exemption applies to any plan "described in" Section 4211(d)(1),  Energy West argues that the statutory exemption is not applicable to the 1974 Plan because IRC Section 404(c) does not "apply" to the 1974 Plan.  This argument, although not clearly articulated, appears to be based on an overly narrow interpretation of the term "apply" (which Energy West underlines several times for emphasis). (*See* EW Opp. at 15). The definition of the term "apply" includes "to have relevance or a valid connection" (Merriam-Webster's College Dictionary, 10th Ed. 1993), "to be pertinent or relevant" (American Heritage Dictionary of the English Language, 5th Ed. 2016), and to "be relevant." (Concise Oxford English Dictionary, 11th Ed. 2006). Seen in this light, IRC Section 404(c), which is relevant and pertinent only to the coal industry, clearly applies to the 1974 Plan, which is "a continuation of" the 1950 W&F Fund.

Third, Energy West claims that Congress intended Section 404(c) to be temporary.  (EW Opp. at 15).  This argument misses the point.  Indeed, whether or not IRC Section 404(c) was intended to be temporary is irrelevant under ERISA Section 4211(d)(2), which is the source of the exemption.  Section 4211(d)(2) is not temporary and does not contain any provision stating that it was intended to be temporary.  The special withdrawal liability rules set forth in that provision apply to any plan or continuation of a plan *"described in"* IRC Section 404(c), regardless of whether the plans described in 404(c) were temporary or became tax qualified in 1976.  Moreover,

the fact that Congress continued to refer to the 1974 Plan in the Coal Act of 1992 as a continuation of a plan "*described in section 404(c)*" completely undermines Energy West's argument that the 1974 Plan "surrendered" its 404(c) status when it became tax qualified in 1976.

Fourth, Energy West points to a stray sentence in a 1974 Committee report on ERISA that states that the "bill provides that Section 404(c) is not to apply to the pension plan once it becomes a qualified [tax exempt] plan." (EW Opp. at 15). A 1974 Committee Report sheds no light on what Congress intended in 1980 when it enacted both withdrawal liability and the special exemptions for plans in the coal industry. Significantly, the special exemptions set forth in ERISA Section 4211(d) are not temporary, and Congress did not include any language stating or suggesting that they are temporary or conditioned on a plan's tax exempt status. Moreover, the fact that Congress considered a provision like this for insertion into ERISA in 1974 but did not actually include it in the final bill (or in MPPAA six years later) further reveals Congress's intent not to make the special exemptions irrelevant when the coal industry plans became tax exempt in 1976.

Fifth, Energy West argues that Section "404(c) is inapplicable as a whole because the second sentence of Section 404(c) is inoperable." (EW Opp. at 16). Again, this misses the mark because the key point is that ERISA's special withdrawal liability exemptions apply to any plan "described in" ERISA 4211(d)(1), and not whether IRS Section 404(c) is operable. The "second sentence" of IRC Section 404(c) concerns which individuals employed before July 1, 1974 are to be treated as employees of a contributing employer. (*Id.*). The "second sentence" of IRC Section 404(c) is irrelevant to the statutory exemption applicable to this case. Moreover, and contrary to Energy West's contentions, the second sentence simply adds technical language to ensure that certain individuals (for example, owner/operator truck drivers) are treated as "employees" so that

the plan could meet the requirement that it is a plan holding funds for the exclusive benefit of employees.  *See* H.R. Report 93-779 at 2590, 2754 (excerpts) (February 5, 1974).

Sixth, even if one attempts to follow Energy West's bizarre statutory argument, it rests on the omission of key language that contradicts Energy West's assertion that Section 404(c) no longer applies to the 1974 Plan.  Contrary to Energy West's assertions, the "fourth sentence" of IRC Section 404(c) does not say that 404(c) will have "no application . . . on or after any date on which such trust is qualified for exemption." (EW Opp. at 15.) What the fourth sentence actually says is that Section 404(c) "shall have no application *with respect to amounts contributed to a trust* on or after any date on which such trust is qualified for exemption from tax under section 501(a)." (emphasis added).  In other words, the actual language of the fourth sentence of 404(c) reveals an entirely different meaning from that asserted by Energy West.  The full statutory provision set forth in the fourth sentence merely says that once a 404(c) plan obtains qualification under IRC Sections 401(a) and 501(a), the special deductibility provisions *applicable to employer contributions* to a plan described in Section 404(c) no longer apply.  Instead of being deductible under Section 404(c), such employer contributions would instead be deductible under IRC Section 404(a)(1)(A), which is applicable to employer contributions to plans qualified under Section 401(a).  There is nothing in this provision that nullifies Section 404(c) or says it somehow expires when a plan becomes tax qualified.

Finally, Energy West's arguments prove too much.  Energy West has conceded that the reference to a "continuation of" a plan described in Section 404(c) was intended to, and did in fact, apply to the 1950 Pension Plan.  (*See* EW Memo in Support of Motion for Summary Judgment, at 17).  What Energy West fails to explain, however, is that the 1950 Pension Plan received its own tax qualification under IRC Section 404(c) at the same time as the 1974 Plan.  Thus, if the 1974

Plan somehow lost or surrendered its status as "a continuation of" a plan described in Section 404(c) when it became tax qualified in 1976, then so too did the 1950 Plan. Energy West cannot have it both ways. If the 1974 Plan lost its special status when it became tax exempt in 1976, then so did the 1950 Plan. Moreover, Congress in 1980 clearly did not create special withdrawal liability exemptions in ERISA Section 4211(d) that do not apply to *any* plan. As the Arbitrator correctly noted, "If it had been Congress's intent that the Section 404(c) coverage would end once a plan became qualified under Section 401(a), it makes no sense that Congress would have used the "continuation of such a plan" language. There were no other plans that could possibly have been characterized a continuations of a plan to which Section 404(c) applied."

## V.    CONCLUSION

For all of the foregoing reasons, and the reasons stated in the Plan's Motion for Summary Judgment and its Opposition to Energy West's Motion for Summary Judgment, the Trustees of the 1974 Plan submit that the Plan's Motion for Summary Judgment should be granted, that Energy West's motion for Summary Judgment should be denied, and that the Arbitrator's Award should be enforced.

Respectfully submitted,

/s/ *Charles P. Groppe*
John R. Mooney
   DC Bar No. 375886
Paul A. Green
   DC Bar No. 383588
Olga M. Thall
   DC Bar No. 1016248
Mooney, Green, Saindon,
Murphy & Welch, P.C.
1920 L. Street, NW, Suite 400
Washington, DC 20036
(202) 783-0100
(202) 783-6088 facsimile
jmooney@mooneygreen.com
pgreen@mooneygreen.com
omthall@mooneygreen.com

Stanley F. Lechner
   DC Bar No. 370986
Charles P. Groppe
   DC Bar No. 464035
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5079
(202) 739-3001 facsimile
slechner@morganlewis.com
cgroppe@morganlewis.com

Glenda S. Finch
   DC Bar No. 418206
Larry D. Newsome
   DC Bar No. 254763
UMWA Health & Retirement Funds
2121 K Street, NW
Washington, DC 20037
gfinch@umwafunds.org
lnewsome@umwafunds.org

*Counsel for the 1974 Pension Plan*
*and its Trustees*

**Dated**: May 31, 2019

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2019, I served or caused to be served the foregoing Plaintiffs' Opposition to Defendant's Motion for Summary Judgment to Vacate Arbitration Award and Plaintiff's  Response to Defendant's Statement of Material Facts via ECF:

> Gregory J. Ossi
> Drinker Biddle & Reath
> 1500 K Street, N.W.
> Washington DC 20005
> (202) 230-5393
> (202) 842-8465 (fax)
> gregory.ossi@dbr.com
>
> *Counsel for Energy West Mining Company*

> */s/ Charles P. Groppe*_____
> Charles P. Groppe
> DC Bar No. 464035